(Surrogate's Court, Chenango County.　October, 1914.)

1. WILLS (§ 55*)—TESTAMENTARY CAPACITY—SUFFICIENCY OF EVIDENCE.
   Evidence on the probate of a will *held* to show the existence of testamentary capacity to execute the will.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

2. WILLS (§ 43*)—TESTAMENTARY CAPACITY—DRUG HABIT.
   A testatrix does not lack testamentary capacity merely by reason of her habitual use of drugs, where she is lucid and sober when her will is made.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 88; Dec. Dig. § 43.*]

3. EVIDENCE (§ 570*)—EXPERT TESTIMONY—PROBATIVE EFFECT.
   Little weight will be given to a physician's answer to a hypothetical question which assumes facts not found by the court.
   [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2395; Dec. Dig. § 570.*]

4. WILLS (§ 215*)—PROBATE—MATTERS CONSIDERED.
   On the probate of a will, objected to on the ground of undue influence and testamentary incapacity, the surrogate will not decide whether testatrix made the most equitable will that she could have made, or made the will which the surrogate would have made if in the same position, but whether she was competent to make a will and not subject to undue influence.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 522, 523; Dec. Dig. § 215.*]

Proceedings on the probate of the will of Emily A. Robinson, deceased.　Decree for proponents.

Duane L. Atkyns and E. H. O'Connor, both of Sherburne, for proponent.

Ward N. Truesdell, of Sherburne, for special guardian.

HILL, S.　Emily A. Robinson died at the town of Sherburne on September 9, 1913.　She was about 66 years of age.　For many years unquestionably the decedent had been addicted to the use of morphine. The husband of the decedent died several years prior to her death, and the only son of the decedent, one James Robinson, also died prior to her decease.　Her deceased son, James Robinson, left him surviving a widow, Edith Robinson, and the grandson, Robert Robinson, whose special guardian herein contests the probate of this will.

The will in question was drawn on the afternoon prior to the death of Mrs. Robinson at night.　The testimony is conflicting as to whether the will was drawn between 3 and 4 o'clock in the afternoon, or as late as 6 o'clock in the afternoon.　The decedent went into a state of coma prior to 7:30 o'clock in the evening, or, if it might not properly be called a state of coma, she was entirely irrational.　Between 5 and 6 o'clock in the afternoon a disinterested witness testifies that decedent was able to go from the bed to a chair in her room unaided and unassisted and seemed to be rational and in her right mind.　I am left to surmise to some extent just what was the immediate cause of death,

as the above-mentioned witness, Ellen Wildman, disinterested and reputable, testifies that between 5 and 5:30 o'clock on the afternoon of September 8th she saw Mrs. Robinson sitting in a chair in her bedroom, and saw her go from the chair to the bed, and Mrs. Robinson talked with her about doing business, and decedent thought she would be all right in the morning. At 6:30 a witness, Mrs. Inman, called upon the decedent and found her in a stupor, with her eyes half shut, talking in an incoherent manner. The attending physician was not called, and, as I say, I am left to conjecture as to the immediate cause of death. However, I am convinced, from scraps of testimony at various places, that in the interim between the visit of Mrs. Wildman and the visit of Mrs. Inman the decedent took an overdose of morphine and from its effects died.

[1] The probate of the will is objected to upon the ground of undue influence and testamentary incapacity. Mr. Atkyns, the attorney who drew the will, is very positive, and offers some corroborative testimony to show, that the will was drawn in the middle of the afternoon of September 8th. He testifies that the decedent was in her usual mental condition, except, of course, that she was ill, and the other witness, Mrs. Tracy, who was interested as the daughter of the chief beneficiary, testifies likewise.

The will in question bequeaths unto the cemetery wherein her people are buried the sum of $50, and bequeaths certain keepsakes to other parties, including the grandson, Robert C. Robinson; the articles bequeathed to her grandson being an Elgin open-face watch which belonged to his father, James Robinson, two large landscape oil paintings, all pictures of James C. Robinson, all silver teaspoons, and all books. The remainder, which amounted to the sum of $800, was bequeathed to a stranger, Mrs. Addie Chapin.

The decedent had for many years worked at various places, including some places several miles away from Sherburne, but apparently she had always regarded that vicinity her home. She was the recipient of a pension, which, with the money she earned, supported her. She had received certain life insurance upon the life of her deceased son, James C. Robinson. In the summer of 1913 she seemed to have been engaged in endeavoring to find a home where she might spend her declining years. She contemplated making application to the Masonic Home, and to that end had certain conversations with an official of the Masonic order at Sherburne, but decided not to go there. She settled for a time in the town of Smyrna, but finally, some weeks before her death, she had arranged with the Chapin family, living midway between Sherburne and Smyrna, to stay with them as long as she might live.

The testimony of certain witnesses shows that she contemplated and made plans to purchase the property where the Chapins resided, they being tenants. She talked this over with several persons, including the owner of the property. The attorney, Mr. Atkyns, and she had some talk about it with one of the witnesses produced by the contestant. Mrs. Wildman testifies that decedent said it was her intention to pay in $500, the first payment of the purchase price of the place where the Chapins lived, she to have the privilege of remaining with them

during her lifetime, and at her death the Chapins should have everything she left.

[2] One of the medical witnesses on cross-examination testified that he had been acquainted with the decedent many years, that some time about July 1, 1913, he met her in the village of Sherburne, and in a conversation told her that he had during the past winter in California met a brother of decedent's husband, and the decedent inquired rationally regarding this party and concerning another brother of her husband. This witness testifies that he had inquired of decedent concerning her grandson, and she talked about him rationally and sensibly. On or about the Wednesday before decedent died she had a talk about business with one of the objector's witnesses, Mrs. Nellie Potter, which conversation as detailed impressed me as rational. There have been a great number of witnesses sworn on behalf of the objector, who testified to various peculiar and irrational acts. From the description of these acts, I am led to believe that they were solely the result of a drug which she took, and it is well known that at times the taker of morphine acts in a peculiar and irrational manner. I do not understand that a person addicted to the use of drugs or of liquor, if lucid and sober when a will is made, lacks testamentary ability by reason of the habit. If the decedent had been as irresponsible and as insane as some of the interested witnesses testified, I marvel that they should have permitted her to journey about to Utica, Sherburne, and Smyrna unattended and alone. I should have thought, rather, that they who were interested in her welfare would have had her declared incompetent and watched over and cared for. Their failure to do this leads me to view their testimony as highly colored by their interest in the little grandson, Robert Robinson, or that the acts mentioned were done at the times she was under the influence of the drug.

[3] I do not give great weight to the answer by the physicians to the hypothetical question, for the reason that I do not find as facts all that was assumed in that question. The question assumes a condition between July 13th and August 4th, while decedent was at Mrs. Colwell's, which I do not find existed. The question permitted the doctors to assume that all day prior to 6:30 or 7:30 in the evening on September 8, 1913, the decedent did not talk, which did not state the condition as testified to have existed on that afternoon, and in various other ways the question varies from the state of facts which I find. Had I found the facts as assumed in the question, I would have given weight to the answer of the doctors; but as they answered upon a hypothesis assumed, which I do not find existed, I cannot give it weight. Further, one of the doctors established a rule of law when he said: "Making a will requires a keener mental condition than ordinary business." This rule of law is somewhat at variance, as I understand it, with the holdings in this state.

[4] It is not for me to decide whether Mrs. Robinson made the most equitable will which she could have made, or whether she made the same will which I think I would have made if I had been in her position; but it is for me to decide whether at the time she made the will in question she was of competent capacity to make a will, and not subject to undue influence. This is not exactly the condition of a

woman in the last moments ·of her life bequeathing her property to strangers with whom she was temporarily sojourning. The evidence shows that the decedent contemplated and expected to live her life with the Chapins. It ·shows that several weeks prior to the time when the will was made she had agreed to advance certain money to the Chapins in return for their care of her, and, while it would seem unnatural for decedent to substantially disinherit her grandson, of whom she was very fond, yet it seems that a woman with the little property that she had, and afflicted with the unpleasant habit which she had, confronted with the necessity of living out her life as comfortably as possible, could have made such a will without undue influence, and having in mind the natural objects of her bounty and the nature and extent of her property.

There is no direct proof of undue influence, and as I cannot believe from the testimony of the witnesses that at 3 or 6 o'clock, whenever the will was made, the woman was in a state of coma, or unconscious, and as I do believe that she was in about the condition which she had been in for many months, I decide that within the authorities laid down she was competent to prepare her last will and testament.

The amount of allowance to the special guardian and to proponent can be brought up on consent before me at any time.

Decreed accordingly.